UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BRP COLLEAGUE INC. and<br>BALDWIN KRYSTYN SHERMAN<br>PARTNERS, LLC,<br><br>        Plaintiffs,<br><br>v.<br><br>EDWARD "TEDDY" GILLEN and<br>EDGEWOOD PARTNERS<br>INSURANCE CENTER INC. d/b/a<br>EPIC INSURANCE BROKERS &<br>CONSULTANTS,<br><br>        Defendants. | Civil Action<br>File No. 1:20-cv-03695-LMM |

## PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT AND OPINIONS OF J. LESTER ALEXANDER, III AND MEMORANDUM IN SUPPORT

Plaintiffs BRP Colleague Inc. ("BRP") and Baldwin Krystyn Sherman Partners, LLC ("BKS") (collectively "Plaintiffs"), respectfully move this Court to exclude the testimony of Defendants' purported rebuttal damages expert, J. Lester Alexander, III ("Alexander") in advance of trial pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 599 (1993). As more fully set forth below, Alexander's testimony – as summarized in his Expert Report of March 2, 2022, and his deposition of May 12, 2022 – should be excluded because (1) his methodology is unreliable, and (2) his testimony will not assist the trier of fact to understand the evidence. (Exhibit A, Expert Report of AEA Group, LLC ("Alexander Report"); Exhibit B, Deposition of J. Lester Alexander, III ("Alexander Dep.")). Both defects, individually or in the aggregate, require exclusion of Alexander's testimony.

## FACTUAL OVERVIEW

Plaintiffs' claims against Defendant Edward (Teddy) Gillen ("Gillen") and Defendant Edgewood Partners Insurance Center Inc. ("EPIC") (collectively "Defendants") arise out of Gillen's former employment relationship with Plaintiffs, and current employment relationship with EPIC. More specifically, Plaintiffs assert that Gillen violated the Defend Trade Secrets Act, the Georgia Trade Secrets Act, and his Employee Covenant Agreement with Plaintiffs. Plaintiffs also claim that EPIC has tortiously interfered with contract, business relationships, and expectancies by unlawfully taking Plaintiffs' business for itself (and Gillen) after Plaintiffs rejected EPIC's attempt to purchase Plaintiffs' business. Plaintiffs seek attorney's fees from both Gillen and EPIC.

As a result of the above unlawful actions, Plaintiffs seek lost profit and unjust enrichment damages from Defendants. Joint Prelim. Report, 10, ECF No. 35. Plaintiffs retained expert witnesses who estimated Plaintiffs' lost profits (past and future) to be $991,755. Plaintiffs' economics experts separately opined that EPIC has been unjustly enriched by its wrongful acts in the amount of $710,528. (Exhibit C, Expert Report of Joseph J. Egan and Myles D. Kaluzna, 12). Defendants engaged Alexander to rebut Plaintiffs' expert report.

## STANDARD FOR ADMISSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 allows a qualified expert to present evidence that "will help the trier of fact" to understand the evidence or determine a factual issue, provided (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 588 (1993). In the Eleventh Circuit, the expert must be (1) "qualified to testify competently

regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 589 (1993)). When a purported expert's testimony fails to meet any of these standards, the testimony should be excluded under Fed. R. Evid. 702.

## ARGUMENT

Alexander's testimony attempts to rebut Plaintiffs' expert report and testimony pertaining to Plaintiffs' lost profits only.[1] Alexander's testimony is inadmissible under both the second and the third elements of the *Harcos Chemicals* test.

### I. ALEXANDER'S METHODOLOGY IS INSUFFICIENTLY RELIABLE

Alexander's purported methodology suffers from several flaws, making it insufficiently reliable under the second element of *Harcos Chemicals* test. Courts may consider a number of factors to determine whether an expert's methodology is reliable, including but not limited to: "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (citing *Quiet Tech. DC-8, Inc., v. Hurel-Dubois UK*

---

[1] Notably, Alexander admitted that in his report, he expressed no opinion regarding Plaintiffs' claim of unjust enrichment against EPIC. (Alexander Dep. 15:12-15). Therefore, Plaintiffs' expert testimony as it relates to EPIC's unjust enrichment is unrebutted.

*Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). This list is not exhaustive and courts may also consider other reliability considerations. *Rink*, 400 F.3d at 1286.

> **A. Alexander's Methodology Cannot Be Tested Because He Fails to Explain It.**

Expert testimony must be supported by appropriate validation. *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 590). Because Alexander's supporting methodology is "not sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*," his opinion must be excluded. *Southern States Co-op., Inc. v. Melick Aquafeeds, Inc.*, 476 Fed. Appx. 185, 187 (11th Cir. 2012) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

Alexander's testimony regarding the methodology he allegedly employed in preparing his calculation of Plaintiffs' lost profits manifested his repeated reliance on his subjective viewpoint, under the cloak of purported reliance on industry standards and publications. A few examples follow:

- Plaintiffs' expert, Joseph Egan, relied on the well-established and commonly used "but for" analysis to determine Plaintiffs' lost profits. Alexander did not know what a "but for" analysis entailed. (Alexander Dep. 10:2-11:1).

- Alexander asserts that the fair market value of the insurance commission business that was lost was $413,000. (Alexander Report, at 3). When questioned in his deposition about the methodology relied upon to arrive at this figure, Alexander asserted vaguely that the basis for this conclusion was "valuation science" and "lost profits methodology." (Alexander Dep. 31:23, 25).

- Alexander's Report and calculation of lost profits is based on the presumption that economics damages cannot exceed the total value of the business that was lost. (Alexander Report, at 3). When he was asked to explain the basis for the assertion, however, he failed to cite to a source. He mentioned that "reasonable certainty and economic damages," "Valuation Services Practice A for Lost Profits 2020," and the "Litigation Handbook" would all have support for his methods, without explaining which parts of those publications support the propriety of his method. (Alexander Dep. 34:8-1)5. Alexander was asked whether he relied on the "Litigation Handbook," even though he did not cite the work in his report. (Alexander Dep. 34:16-17). Alexander obfuscated and, while refusing

- to concede he did not rely on the Litigation Handbook, claimed he, "[didn't] need to. It's in my mind." (Alexander Dep. 36:10-12). Alexander's refusal to admit whether he relied on the Litigation Handbook or not makes it difficult to determine how he reached his conclusion, let alone duplicate it.

- In his report, Alexander states that he identified comparable transactions over the previous ten years. (Alexander Report, Appendix 2). When he was asked why he used 10 years, he claimed it was "industry standard." However, he was not able to cite to one source that confirmed his assertion regarding this industry standard. (Alexander Dep. 113:18-114:8).

- In his report, Alexander asserts that "Plaintiff Expert's damage methodology is unreliable and results in a "grossly inflated" damage determination." (Alexander Report, at 3). When asked what qualifies as "grossly" inflated—versus just inflated—he responded "you know it when you see it" and it was "[j]ust common sense." (Alexander Dep. 38:2-10). According to his report, Alexander derived the value of Plaintiffs' lost business from his calculation of Plaintiffs' 2021 lost revenue, multiplied by an alleged median revenue multiple. (Alexander Report, at 1). When asked in his deposition where in his report he explains the methodology relied upon to come up with Plaintiffs' 2021 lost revenue (the first factor he used to calculate Plaintiffs' lost business valuation), Alexander simply claimed "it's math," while admitting the "math is not shown in the report." (Alexander Dep. 101:13, 15, 20-21). To make matters worse, Alexander later testified that he checked the calculation, but admitted he could not recall the numbers used to do this, making it impossible for the jury to assess the reliability or accuracy of his work. (Alexander Dep. 105: 8–11).

Alexander also failed to disclose his methodology for calculating the alleged median multiple – the second factor he employed in calculating Plaintiffs' lost business valuation. First, the median Alexander relied on was not the median of an active, large market in the insurance industry as he claimed. (Alexander Dep. 67:8-15; 68:1-7). Instead, when questioned, Alexander conceded he actually used the median of four transactions that he cherry-picked based on his subjective belief they were most analogous to this case. (Alexander Dep. 68:1-69:3). Alexander admitted these transactions were from several years ago (one dating back 10 years), none took place in the Atlanta market (three of them took place in Florida and one took place in Pittsburgh), and none involved malpractice insurance. (Alexander Report Appendix 2; Alexander Dep. 71:1-72:5; 131:11-132:12). Nevertheless, Alexander concluded these transactions were somehow better predictors of the fair market value of the book of business Gillen and EPIC took from Plaintiffs

than the obvious best comparator – which Alexander ignored, without explanation – namely Plaintiffs' purchase of the *exact same* book of malpractice insurance business from Southern Protective Group just before EPIC and Gillen's wrongful acts. Even if Alexander's subjective designation of purported comparable transactions could be trusted – which it cannot – he did not disclose or explain the methodology he used in selecting the four transactions, particularly to the exclusion of the most obvious, best comparator. Instead, Alexander and Defendants simply ask the Court and jury to trust his unsupported conclusion that the four transactions he identified are the best comparators.

Similarly, while Alexander concluded the multiple of revenue was more accurate and reliable than a multiple of EBIT or a multiple of EBITDA, he failed to provide any of the calculations supporting his conclusion, instead stating that he "doesn't have to." (Alexander Dep. 74:4-77:7).

Because of his failure to cite all the sources he used, show his calculations, or even remember what numbers he used to calculate his final numbers, Alexander's findings are impossible to duplicate, confirm, or refute. Moreover, Alexander's failure to disclose the method he used to reach his conclusions deprives the jury of the ability to test his methodology, confirm his technique has been subjected to peer review, determine the known error rate of the methodology, or determine whether his methodology is accepted under accounting industry standards. Simply stated, Alexander's failure to coherently explain his methodology warrants exclusion of his testimony under **any** of the four factors identified in *Rink,* and the second element of the *Harcos Chemicals* test. In short, Alexander's Report and opinions fall short of the threshold for admissibility of expert testimony under Fed. R. Evid. 702.

### B. Alexander Analysis is Speculative

An expert must be disqualified, and his testimony excluded, unless his testimony reflects "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 599. The expert must be able to articulate the basis for his conclusion, and refrain from basing his analysis on his subjective beliefs. *See KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001). There must be a connection between the expert's conclusion and the existing data. *See McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions").

Within this circuit, courts have found expert reports to be too speculative where experts cannot cite to a basis supporting their conclusions. In *R & R Intern., Inc. v. Manzen, LLC*, where the lost profits in a breach of contract case depended on a product's market share, the damages expert did not conduct any market surveys or identify consumers samples in the analysis. *R & R Intern., Inc. v. Manzen, LLC*, 2010 WL 3605234, at *8 (S.D. Fla. Sept. 12, 2010). The court ultimately excluded the expert, holding his methodology both lacked reliability and would not be helpful to the jury. *Id.; see also Watson v. K2 Design Group, Inc.*, 2016 WL 11783284, at *6–7 (S.D. Fla. Aug. 9, 2016) (finding expert's opinion unreliable when basis of determining lost profits depended on an assumption that the work contributed to between 1/10 and 1/15 of disputed project's total value with no basis for this assumption).

Here, Alexander engages in speculation when calculating Plaintiffs' lost profits. To reach his final damages conclusion, Alexander multiplies Plaintiffs' total 2021 lost revenue by a revenue multiple of 2.03. (Alexander Report Appendix 1). Alexander's use of a revenue multiple is speculative in two ways. First, he does not have support for his assertion that the revenue multiple is more reliable than other methods of calculating damages. (*See* Part I(A), p. 6, *supra* (citing

Alexander Dep. 74:4-77:7)). Second, he calculates the revenue multiple using "comparable" transactions without articulating a basis for his subjective definition of a comparable transaction, and fails to adequately respond when confronted with the ways in which his transactions substantively differed from the business at issue in this case. (*See* Part I(A), p. 5-6, *supra*). Specifically, Alexander notes that his analysis of "comparable transactions from DealStats resulted in a median revenue multiple of 2.03x." (Alexander Expert Report 4; Alexander Dep. 68:1-4). During his deposition, Alexander stated that he had no reason for determining that the multiple of revenue was the most reliable predictor of fair market value:

> Q: Okay. Going back to page four of your report, and I apologize because I suspect you've already told me this. But how did you determine that the multiple of revenue was the most reliable predictor of fair market value?
> A: I don't have anything to add.
> Q: Okay. And you don't cite any source for that statement in your report, correct? We're looking at that middle sentence.
> A: That statement was made in the context of selecting what multiple I would use, so that's the context of the statement. And we've been talking about the coefficient of variation and that's the basis for that statement.

(Alexander Dep. 82:5–18). Ultimately, Alexander's testimony reveals that the 2.03 figure is not a definitive and comprehensive figure that could be relied to adequately measure Plaintiffs' lost profits. It is, rather, a number calculated based on four random and dissimilar transactions from other areas of the country that occurred between 5-10 years ago and that did not involve malpractice insurance books of business. Similar to the cases cited *supra*, Alexander's opinion is speculative because he cannot provide a basis for what is ultimately an assumption – i.e. that the most reliable predictor of fair market value is the revenue multiple derived from transactions on DealStats. As noted above, while Alexander claims his revenue multiple was superior to EBIT and EBITDA, nothing in his report shows the analysis employed to reach this conclusion. Instead, Alexander cited his experience in the industry as sufficient authority for the selection of a revenue

multiple to the exclusion of the other options. (Alexander Dep. 82:20–23). While his experience in the industry may speak to Alexander's qualifications as an expert, those qualifications do not substitute for sound methodology or the other factors identified in *Rink*, all of which are lacking from Alexander's report.

Furthermore, Alexander chose his revenue multiple by taking the median revenue multiple of four transactions he pulled from DealStats. One of the four transactions is from the Pittsburgh market, while the other three are from Florida. With no analysis or investigation for this assertion, Alexander stated that the Atlanta and Pittsburgh markets were on par "from the point of view of profitability of an insurance agency." (Alexander Dep. 134: 3–6). Alexander failed to conduct or rely on any market analyses for this assumption, simply stating "I don't know of any reason why it would be different." (Alexander Dep. 133:13–14). Alexander's calculation of a median revenue multiple and his reliance on the unfounded assertion that the Atlanta and Pittsburgh markets are comparable are impermissibly speculative. Alexander's testimony should be excluded on this basis, particularly where Alexander ignored and disregarded the best, and most obvious comparator transaction without explanation.

Alexander's speculations are coupled with his repeated admissions that he did not have access to—and did not bother to gather—sufficient data for his calculations. Here are a few examples:

- Alexander testified that he used public information (instead of actual data) as proxy to calculate Plaintiffs' profits and losses, without mentioning that fact in his report. (Alexander Dep. 27:17-29:11).

- Alexander cited to IBISWorld Industry Report for predicting a 2.6% growth in the malpractice insurance industry for the next five years. (Alexander Report, at 3). However, during his deposition, he admitted that the 2.6% figure from IBISWorld Industry Report applied to six product and service revenue streams, within which none of the accounts at issue in this case fell. (Alexander Dep. 45:3-48:19; 50:14-52:8). He further admitted that

- he had no evidence that there is any correlation between malpractice insurance premiums and other types of insurance premiums. (Alexander Dep. 53:13-22).

- Alexander has no information regarding the types of insurance sold by the agencies involved in the four allegedly-comparable transactions in his report. (Alexander Dep. 108:8-25).

- Regarding revenue from various accounts, Alexander admitted that he had no knowledge regarding Plaintiffs' expert's calculations, but nevertheless "assumed" the calculation was correct. However, moments later, he changed his answer, stating that he "checked" Plaintiffs' expert's calculation. When asked how he checked it, he stated that he added up numbers, but did not remember what those numbers were. (Alexander Dep. 102:14-105:11).

- When calculating the fair market value, Alexander used the revenue for 2021, but he calculated the revenue without taking into account any renewal revenue. (Alexander Dep. 101:1-21).

- Alexander claims that Plaintiffs' expert underestimated "incremental costs" associated with the accounts, and that 89% of the revenue from the accounts at issue would have gone to costs (i.e. overhead). (Alexander Report, at 3). In calculating this figure, however, Alexander assumed that every BRP cost in every category would have gone up if the accounts at issue remained with BRP, not because actual historic data supported the assertion (Alexander admitted that he did not have enough details), but because costs are "inherently incremental." (Alexander Dep. 152:25-157:1). According to Alexander's analysis, BRP would have had even higher rent, and fees associated with accounting and legal services, if BRP had retained the accounts at issue. (Alexander Report, Appendix 4).

- Alexander admitted that profit calculations could change depending on the valuation date, but he failed to include a valuation date in his report. (Alexander Dep. 98:7-99:13). He claimed that he used whatever date Plaintiffs' expert had used in his report, but was not able to tell what that date was. *Id*. In fact, Plaintiffs' expert did not use a fixed date because the loss of policies occurred over time.

As these examples show, Defendants' expert has repeatedly treated relevant data as optional in his analysis of key measures. Alexander's report and testimony clearly manifest his priority to use information that served his ultimate goal, which was to arrive at an artificially low number for Plaintiffs' damages. Because his testimony will be based on speculative facts and data, it must be excluded.

## II. ALEXANDER'S TESTIMONY WILL NOT ASSIST THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE

As the Supreme Court has made clear in *Daubert*, Rule 702 requires the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert evidence. 509 U.S. at 589 n. 7, 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Because Alexander's methodology is unreliable, he is unable to explain the superiority of his calculation method over Plaintiffs' expert, he relies on subjective observations and opinions, and he failed to seek and rely on relevant data, his testimony will not assist the jury to determine the propriety of Plaintiffs' expert's calculations. To the contrary, Alexander's testimony will confuse the jury, and poses the risk of being highly prejudicial to Plaintiffs. The jury will see Alexander's proposed revenue multiple and his "incremental cost" percentage but Alexander cannot explain the math and data underlying these figures that form the basis of this conclusions. The jury will be more confused at the end of his testimony than in the beginning. There is a risk that the jury will simply assume the truth of Alexander's conclusions without needing to fully understand his analysis because he is an "expert." It is exactly in a situation such as this that the Court's gatekeeping function is triggered to prevent unsound analysis to contaminate the trial and the minds of the jury. Because Alexander's testimony—and his reliance on speculation, irrelevant data, and uncited assertions—will not assist the trier of fact to understand the evidence, it should be excluded from the trial.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Motion and exclude Alexander's expert opinions as they relate to the opinions expressed in his Report, including all related deposition testimony and all prior reports.

Respectfully submitted this 11th day of August, 2023.

/s/ Todd C. Duffield
Todd C. Duffield
Georgia Bar No. 141905
Katherine H. Krouse
Georgia Bar No. 514298
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART, P.C.
191 Peachtree Street, N.E., Suite 4800
Atlanta, Georgia 30303
Telephone: (404) 881-1300
todd.duffield@ogletree.com
katie.krouse@ogletree.com

Daniel P. Johnson – *admitted pro hac*
OGLETREE, DEAKINS, NASH, SMOAK
  & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, Missouri 64111
Telephone: (816) 410-2233
daniel.johnson@ogletree.com

**Counsel for Plaintiffs**