# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BRP COLLEAGUE INC. and
BALDWIN KRYSTYN SHERMAN
PARTNERS, LLC,

   Plaintiffs,

v.

EDWARD "TEDDY" GILLEN and
EDGEWOOD PARTNERS
INSURANCE CENTER INC. d/b/a
EPIC INSURANCE BROKERS &
CONSULTANTS,

   Defendants.

Case No. 1:20-cv-03695-LMM

Hon. Leigh Martin May

## DEFENDANTS' BRIEF IN OPPOSITION TO
## PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE
## <u>EXPERT REPORT AND OPINIONS OF J. LESTER ALEXANDER, III</u>

Plaintiffs BRP Colleague Inc. and Baldwin Krystyn Sherman Partners, LLC's (together, "Plaintiffs") *Daubert* Motion to Exclude Expert Report and Opinions of J. Lester Alexander, III, Dkt. No. [243], (cited herein as the "Motion") should be denied. Plaintiffs' arguments do not address admissibility, but rather the weight and credibility of Defendants' expert's opinions, which is the express purview of the jury.

The parties dispute, among other things, the extent of any profits Plaintiffs purportedly lost after Defendant Edward "Teddy" Gillen left Plaintiff Baldwin

1

Krystyn Sherman Partners, LLC ("BKS") to go work at Defendant Edgewood Partners Insurance Center Inc. (Mr. Gillen and Edgewood together are the "Defendants"). J. Lester Alexander, III – a Certified Public Accountant (among other credentials) and former partner at the accountancies PricewaterhouseCoopers and Coopers & Lybrand – reviewed the opinion of Plaintiffs' damages expert, Joseph J. Egan, and found it wanting.[1] Mr. Alexander does not offer any calculation of lost profits. He only rebuts Mr. Egan's calculations, drawing the ultimate conclusions that Mr. Egan's "damages methodology is unreliable" and that Mr. Egan's calculation of "Plaintiff's lost profits [is] inflated." Alexander Report, Dkt. No. [243-1] at 7, ¶ 5.

The Court's only decision on this motion is whether Mr. Alexander's opinion is sufficiently reliable to be admitted as rebuttal evidence. The Court does not need to decide whether Mr. Alexander's opinions are correct, and in fact the law commands that this decision is left to the jury. However, if Mr. Egan's opinions (which are subject to Defendants' own *Daubert* motion) are not admissible, there is no need to present such rebuttal evidence.

**Legal Standards**

Under Fed. R. Evid. 702 and *Daubert*, trial courts "act as 'gatekeepers' to

---

[1] Mr. Alexander is a rebuttal witness who assumes Defendants' liability to Plaintiffs. Defendants deny they are liable to Plaintiffs.

ensure that speculative, unreliable expert testimony does not reach the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) (citation omitted). Expert testimony is admissible when:

> (1) [t]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* at 1340-1341 (citation omitted). Defendants must show that Mr. Alexander's opinion meets these criteria by a mere preponderance of the evidence. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1312-13 (11th Cir. 2014).

Where admissibility is contestable, a court should permit the expert to present (in this case) his testimony. The court's gatekeeping function "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citation omitted). "Courts in this district routinely find that any conflict between an expert's proffered testimony and the underlying evidence or facts goes to the weight – not admissibility – of the testimony." *Giusto v. Int'l Paper Co.*, 571 F. Supp. 3d 1346, 1362 (N.D. Ga. 2021) (collecting cases).

## Argument

Mr. Alexander offers two opinions. Both should be admitted, but even if either opinion is excluded, Mr. Alexander's other opinion remains admissible nonetheless. First, Mr. Alexander has opined that Mr. Egan's calculation of $1

million for Plaintiffs' lost profits is absurd, because as Mr. Alexander shows, the fair market value of the insurance commission business that BKS supposedly lost is just $413,000. Alexander Report, Dkt. No. [243-1] at 11.

Second, Mr. Alexander also observed an error in Mr. Egan's calculation which, when corrected, yields lost profits of no more than $147,000 – and only $42,000 if damages are limited to the two-year period of Mr. Gillen's post-employment covenant. *Compare* Egan Report, Dkt. No. [243-13] at 50-52; *with* Alexander Report, Dkt. No. [243-1] at 13. Mr. Alexander's critique of Plaintiffs' lost profits in no ways references or depends upon Mr. Alexander's calculation of $413,000 as the fair market value of the insurance commission business purportedly lost. Alexander Report, Dkt. No. [243-1] at 13.

Plaintiffs argue that Mr. Alexander's opinions are unreliable. They dispute his fair market value calculation at length while taking only a few passing shots at his critique of their supposed lost profits. As shown below, Mr. Alexander's fair market value calculation is entirely reliable. So is his lost profits critique. Also, while purporting to argue that Mr. Alexander's opinions cannot assist the fact finder simply because those opinions are unduly prejudicial to them, Plaintiffs advance an argument that must be judged under the standards set by Fed. R. Evid. 403 – which high standards their argument fails to meet.

### 1. Mr. Alexander's Calculation of Fair Market Value Is Reliable

#### a. Mr. Alexander Faithfully Applied a Well-Established Method of Calculating Fair Market Value

Plaintiffs strongly dislike having their claim to $1 million in lost profits compared to the market value of the insurance brokerage business that supposedly would have created those profits – a book of insurance commissions worth only a little more than $400,000.  As Mr. Alexander puts it, "you can go and test . . . whether the lost profits, the future lost profits makes sense," and "the answer is no, it does not because it exceeds the fair market value of the business."  Alexander Dep.,[2] Dkt. No. [243-2] at 34 ln. 18 – 35 ln. 2.  "To give more than the market value would be a windfall and improper."  *Id.* at 33 ln. 17-18.

Mr. Alexander calculates $413,000 to be the fair market value of the insurance commission business Plaintiffs lost by multiplying Plaintiffs' purportedly lost 2021 revenue of $203,694 by a "revenue multiple" of 2.03.  Alexander Report, Dkt. No. [243-1] at 11.  This formula comes from the "guideline transaction method of the

---

[2]     Attached hereto as Exhibit A are the relevant excerpts of transcript of Mr. Alexander's deposition testimony.  Plaintiffs submitted the complete unredacted transcript with their Motion.

market approach." *Id.* at 7, ¶ 6.[3]  Among others, the American Institute of Certified Public Accountants ("AICPA") publishes guides on this valuation method. Alexander Dep., Dkt. No. [243-2] at 33 ln. 1– 36 ln. 19.  One such guide referenced by Mr. Alexander is the AICPA's 06-4 Practice Aid, which Mr. Egan himself cites. *Compare* Alexander Dep., Dkt. No. [243-2] at 35 ln. 3 – 36 ln. 19; *with* Egan Report, Dkt. No. [243-13] at 15 n.54.  The AICPA is recognized as an authoritative source by Plaintiffs' expert.[4]  Plaintiffs submit nothing to dispute the AICPA either as a relevant authority or as a definitive source of Mr. Alexander's methodology.

Plaintiffs complain about Mr. Alexander's report lacking any citations for the principle that their lost profits "cannot exceed the total value of the business that was lost."  Motion, Dkt. No. [243] at 4.  Mr. Egan's method of calculating lost profits is based on income valuation (in contrast to Mr. Alexander's method based on market valuation) of calculating fair market value.  Alexander Dep., Dkt. No. [243-2] at 60

---

[3]     The guideline transaction method is detailed in chapter 3 of Shannon Pratt, *The Market Approach to Valuing Businesses*, Second Ed., Dkt. No. [243-6] at 27-35 (hereinafter "Pratt Book").  The AICPA defines "Market (Market-based) Approach" and "guideline company transactions method" at pages 35 and 39 of its 2015 Statement on Standards for Valuation Services No. 1.  This "AICPA Statement" is available at https://www.aicpa-cima.com/resources/download/statement-on-standards-for-valuation-services-vs-section-100.

[4]     Myles Kaluzna, who co-authored Mr. Egan's report, authored and edited several AICPA Practice Aids for the Forensic & Valuation Services Section.  Egan Report, Dkt. No. [243-13] at 4, ¶ 3.

ln. 13 – 61 ln. 25 & at 87 ln. 19-21.  When valuing a business, the income- and market-based calculations of that business's value should roughly converge.  *Id.* at 61 ln. 10-16.  Mr. Egan's calculation is 2.5 times greater than Mr. Alexander's, so something is clearly off.[5]  *Id.* at 38 ln. 2-18; *see* AICPA Statement ¶ 42 ("In arriving at a conclusion of value, the valuation analyst should (a) correlate and reconcile the results obtained under the different approaches and methods used; (b) assess the reliability of the results under the different approaches and methods . . . .").  (As we discuss below, Mr. Alexander identified at least one error in Mr. Egan's calculation.)

Fair market value of a business can be calculated by multiplying that business's sales by a ratio of Market Value of Invested Capital ("MVIC") to sales derived from the data of comparable businesses.  DealStats Companion Guide 2023 Ed. 27, 33-34.[6]  Mr. Egan calculated the 2021 revenue for the business Plaintiffs supposedly lost to be $203,694.  Mr. Alexander used the same figure.  *Compare* Alexander Report, Dkt. No. [243-1] at 11 n. 1; *with* Egan Report, Dkt. No. [243-13] at 52.

---

[5]     As explained in Defendants' *Daubert* motion to exclude Mr. Egan's testimony, Dkt. No. [234], Mr. Egan's testimony is wholly unreliable for multiple independent reasons.  If Mr. Egan's testimony is excluded, then Mr. Alexander's rebuttal of that testimony would not be needed.

[6]     This "DealStats Guide" is available at https://www.bvresources.com/docs/default-source/free-downloads/dealstats-companion-guide.pdf.

Mr. Alexander then multiplied this revenue by 2.03, which is a ratio of MVIC to sales. Alexander Report, Dkt. No. [243-1] at 11. 2.03 is the median ratio derived from data on the sales of other insurance brokerage businesses. *Id.* at 12; Alexander Dep., Dkt. No. [243-2] at 69 ln. 8-12; 108 ln. 23 – 109 ln. 7. MVIC is the price paid to purchase those other businesses. Alexander Dep., Dkt. No. [243-2] at 111 ln. 22 – 112, ln. 3; Alexander Report, Dkt. No. [243-1] at 12 n. 3. Comparing MVIC to that business's sales identifies a ratio that can be used as a multiple. "The market approach primarily uses *multiples*," which "are factors by which we multiply some fundamental financial variable to get an indication of value." Pratt Book, Dkt. No. [243-5] at 61. This valuation theory is based on the premise that similar assets sell at similar prices and that the type of ratio used in comparing businesses is the same across similar businesses. *See id.* at 58-59.

Mr. Alexander derived a 2.03 multiplier first by selecting comparable transactions from the database made available by DealStats (formerly Pratt's Stats). Alexander Report, Dkt. No. [243-1] at 12; Alexander Dep., Dkt. No. [243-2] at 69 ln. 8-20. The DealStats database has compiled "the most complete financials on acquired companies in both the private and public sectors." https://www.bvresources.com/products/dealstats; *see* Alexander Dep., Dkt. No. [243-2] at 113 ln. 3-22. Mr. Alexander then isolated the relevant transactions by first focusing on transactions in the last ten years involving businesses coded as Insurance Agents,

Brokers and Service – *i.e.*, the type of business in dispute here. Alexander Report, Dkt. No. [243-1] at 12 nn. 1, 2; Alexander Dep., Dkt. No. [243-2] at 109 ln. 3-7. He then further limited the data set to those transactions that, like here, had a restrictive covenant period of two years, and he excluded insurance adjusters, P&C insurers, and auto insurers, Alexander Report, Dkt. No. [243-1] at 12 n. 2 – which businesses are dissimilar from the insurance brokerage at issue in this case.

Next, Mr. Alexander found the median MVIC/sales ratio, which was 2.03. Alexander Report, Dkt. No. [243-1] at 12;[7] *see* DealStats Guide 30-31 (favoring the median over the arithmetic mean (average)); Pratt Book, Dkt. No. [243-7] at 13 (noting that "we tend to prefer the median over the mean"). Mr. Alexander chose this multiplier because its low coefficient of variation indicated that the multiplier is reliable. Alexander Report, Dkt. No. [243-1] at 8, ¶ 6 & at 12 n. 5; Alexander Dep., Dkt. No. [243-2] at 74 ln. 21 – 76 ln. 22, & at 81 ln. 17 – 82 ln. 8; *see* DealStats Guide 29 ("The belief is that the valuation multiples with the lowest CVs [coefficients of variation] . . . may be the better indicators of value.").

Thus Mr. Alexander based his fair market valuation of Plaintiffs' supposedly lost business on a reliable methodology, all as he fully explained and as is substantiated in the authoritative accountancy literature.

---

[7] Because the data set has an even number of transactions, Mr. Alexander took the average of the two middle MVIC/sales ratios $(2.03 = (1.99 + 2.07) / 2)$.

b. Plaintiffs' Arguments Against Mr. Alexander's Fair Market Valuation Fail; But These Disputes Are for the Jury to Decide If Mr. Egan Is Permitted to Testify

Plaintiffs mischaracterize Mr. Alexander's calculation of fair market value as a calculation of lost profits. Motion, Dkt. No. [243] at 4, 7. It is not. Rather, it is a value that can be expected to be paid by a reasonable buyer of the business. Pratt Book, Dkt. No. [243-7] at 21. As explained above, it makes no economic, market-based sense for Plaintiffs to claim lost profits that are 240% of the fair market value of the allegedly lost business. Plaintiffs claim that "[b]ecause of his failure to cite all the sources he used, show his calculations, or even remember what numbers he used to calculate his final numbers, Alexander's findings are impossible to duplicate, confirm or refute." Motion, Dkt. No. [243] at 6. As demonstrated above, Defendants have recounted Mr. Alexander's calculations, data, and "final numbers," complete with citations to his report, his testimony, and relevant accountancy authorities. If Mr. Egan is permitted to testify, Mr. Alexander's opinion necessarily also should be put to the jury for them to decide whether it is more persuasive than Mr. Egan's.

Plaintiffs dispute virtually every aspect of the 2.03 revenue multiplier used by Mr. Alexander. They say he did not disclose his method for calculating the multiplier. *Id.* at 5, 6. Again, his methodology is detailed above, with support from his report and his testimony. They claim he admitted to having "no reason" for concluding that the MVIC/sales ratio was the most reliable multiple. *Id.* at 8. This

assertion fails to grapple with his explanation that this ratio was the most reliable "based on the coefficient of variation between fair market value and revenue," as described above. Alexander Report, Dkt. No. [243-1] at 8, ¶ 6. At his deposition, Mr. Alexander explained this coefficient concept to Plaintiffs at length. Alexander Dep., Dkt. No. [243-2] at 74 ln. 21 – 83 ln. 18. Naturally Plaintiffs quote Mr. Alexander's conclusion that he "do[es]n't have anything to add" to those ten pages of testimony which Plaintiffs ignore in their Motion. Motion, Dkt. No. [243] at 8. It is a complete *non sequitur* for Plaintiffs to simply ignore Mr. Alexander's explanation of why the multiple he selected is the most reliable.

Plaintiffs think Mr. Alexander's look-back period of 10 years is arbitrary. *Id.* at 5, 8. Perhaps Plaintiffs believe that Mr. Alexander should have used even older data from DealStats. They offer no proof that any such data was available in the DealStats database. Or perhaps Plaintiffs believe Mr. Alexander should have used only data closer in time to the 2020 events at issue in this case. The data in Mr. Alexander's selection is from 2013 to 2018,[8] and Plaintiffs give no reason to believe that any of that data is stale. (If the 2013 data were excluded, the new median / revenue multiplier is 1.99 – a worse result for Plaintiffs.)

Plaintiffs also argue that the records in the data set are not comparable to the

_____

[8] When Plaintiffs contend that one record "dat[es] back 10 years," they mean ten years from present day. Motion, Dkt. No. [243] at 5.

transaction at issue. *Id.* at 5, 8. Plaintiffs contend that Mr. Alexander possessed but ignored a large data set of transactions in the entire insurance industry. *See id.* 5. Data on *all* insurance industry transactions would be inappropriate, because insurance brokerages are patently different operations from insurance underwriting or claims administration businesses. Therefore, as explained above, Mr. Alexander limited his data set to those transactions identified by DealStats as involving an insurance brokerage. The selection that resulted was identified through Mr. Alexander's use of objective criteria ensuring that the nature of the selected data best approximates the nature of the business at issue. Notably, Plaintiffs do not offer *any* data from the DealStats database that they contend Mr. Alexander should have included in the selection, but failed to include.

Plaintiffs also complain about the selected brokerages being outside of Atlanta elsewhere in the Eastern time zone. *Id.* at 5, 8. But they offer no argument for why the ratio of a brokerage's sales price to its sales might be affected by the geographical location of the brokerage's offices. They also complain that the selected brokerages do not intermediate malpractice insurance. *Id.* at 5, 8, 10. Again, they offer no argument for why the ratio of the brokerage's sales price to its sales might be altered by the precise insurance product that the brokerage intermediates. It is unclear why geography or insurance product are so significant to Plaintiffs' fair market value that Mr. Alexander's opinion is unreliable.

Plaintiffs effectively concede their motion when they criticize Mr. Alexander for supposedly ignoring the "best" data to compare to Plaintiffs' supposedly lost business and failing to prove that his multiple is "more reliable than other methods." *Id.* at 5-6, 7. It is the jury's duty to decide which expert's data (and therefore which opinion) is best. The court's role on this motion is to simply decide whether Mr. Alexander's opinion is sufficiently reliable – grounded in established methodology – that the parties can debate his opinion before the jury. *See Quiet Tech.*, 326 F.3d at 1341 (On a *Daubert* motion, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.").

Similarly, Plaintiffs say that Mr. Alexander has not proven that other multiples are less accurate. Motion, Dkt. No. [243] at 6 (discussing EBIT, EBITDA). This argument is irrelevant to the question of whether Mr. Alexander's methodology is reliable, even if it might be improved. Further, Plaintiffs have the same data Mr. Alexander used to calculate his 2.03 MVIC/sales multiple, and they can calculate those other multiples themselves. Plaintiffs have not come forth with a multiple better than Mr. Alexander's.

Plaintiffs criticize the revenue figure Mr. Alexander uses for 2021, claiming he did not disclose his calculation of this figure. *Id.* at 5. Yet, this is the exact same revenue figure calculated by their expert, Mr. Egan. Egan Report, Dkt. No. [243-13] at 52. If this figure causes Mr. Alexander's opinion to be deemed unreliable,

then Mr. Egan's opinion is unreliable too. *See Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1330 (11th Cir. 2014) (refusing to exclude plaintiff's expert for using methodology used by defendant's expert). Plaintiffs also criticize Mr. Alexander (and, presumably, Mr. Egan) for not including "renewal revenue" in the 2021 revenue. Motion, Dkt. No. [243] at 10. The revenue the experts calculated included whatever commission was brought in by the business in 2021 whether on an original policy or on a renewal policy. Contrary to Plaintiffs' suggestion, 2021 revenue does not and should not include commissions paid after 2021 on renewal policies. Today's revenue does not include money that might be pocketed in the future (think: Enron).

The rest of Plaintiffs' points are, at best, pedantic. They claim he does not know what "but for" meant when Mr. Egan asserted Plaintiffs' calculation of damages. *Id.* at 4. (Wrong – he knew.[9]) Their point does not address the issue at

---

[9]  When asked for his definition of "but-for," he answered: "But for everything being alleged here." Alexander Dep., Dkt. No. [243-2] at 12 ln. 2-8; *see* AICPA and CIMA, *Forensic & Valuation Services Practice Aid Calculating Lost Profits, 2020*, 19 ("[D]amages based on lost profits redress a defendant's unlawful act or acts by compensating the plaintiff for the profits that would have been obtained 'but for' (absent) the unlawful act or acts.") (cited at Alexander Report, Dkt. No. [243-1] at 7); *e.g.*, *Healy v. AT&T Servs., Inc.*, 362 So. 3d 14, 18 (Miss. 2023) (commanding that damages are to be calculated "but for the breach"); *Dental Health Prod., Inc. v. Sunshine Cleaning Gen. Servs., Inc.*, 2023 WL 2163495, at \*3 (E.D. Wis. Feb. 22, 2023) ("but for the failure of the other party to perform"); *Eagle Realty Invs., Inc. v. Dumon*, 2022-Ohio-4106, ¶ 22, 201 N.E.3d 963, 971 ("but for the breach").

hand, which is whether Mr. Alexander's opinion is reliable. They fault him for knowing authoritative accountancy sources without needing to review them while preparing his report. *Id.* Even so, he fully explained his calculation, which is supported by well-known accounting authorities. They apparently believe it is disqualifying that he would describe Mr. Egan's damages calculation as "grossly inflated" as opposed to just "inflated" if "grossly" does not have a technical or measurable meaning. *Id.* at 5. Whatever the salience of this argument may be, this argument does not contest the reliability of Mr. Alexander's fair market valuation. They take issue with his citation in support of the principle that "[i]nsurance commissions are bought and sold in an active marketplace." *Compare* Motion Dkt. No. [243] at 9-10 (re: IBISWorld Industry Report); *with* Alexander Report Dkt. No. [243-1] at 7, ¶ 5 & n. 1. Their criticism of the source is incorrect, and Plaintiffs do not even dispute this anodyne statement. Most importantly, because it does not factor into Mr. Alexander's fair market valuation, it cannot shed light on whether Mr. Alexander used reliable methods in arriving at his opinion. Whatever may be the weight (if any) of these irrelevant arguments is for the jury to decide.

      c.  Mr. Alexander's Opinion Is Obviously Reliable in Comparison to the Opinions Disqualified in the Cases Plaintiffs Cited

Plaintiffs cite cases that have nothing to do with the question of Mr. Alexander's reliability. Motion, Dkt. No. [243] at 7. Whereas Mr. Alexander applied objective criteria to filter the DealStats' data into relevant entries, the expert

in *R & R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *13 (S.D. Fla. Sept. 12, 2010) included one comparable business and several incomparable ones, and the validity of the one comparable business's information was doubtful given that it went out of business. In contrast to Mr. Alexander's use of objective criteria validated by methods established in accountancy authorities, the expert in *Watson v. K2 Design Grp., Inc.*, 2016 WL 11783284, at *6 (S.D. Fla. Aug. 9, 2016) calculated damages in part based on his "feelings." Mr. Alexander's opinion is plainly on better footing than those.

### 2. Mr. Alexander's Critique of Mr. Egan's Lost Profits Calculation Is Reliable

Apart from his opinion that the fair market value of Plaintiffs' supposedly lost business is a bit more than $400,000, Mr. Alexander also opines that Mr. Egan's calculation of damages includes an error that when corrected, results in Plaintiffs having lost profits of no more than $147,000. Mr. Egan's error lay in calculating profits by reducing Plaintiffs' revenue by only 26%. Alexander Report, Dkt. No. [243-1] at 7-8, ¶ 5. According to Plaintiffs' parent company's public filings, its costs were 89% of revenues. *Id.* Replacing 26% with 89% while otherwise leaving Mr. Egan's calculation untouched changes Plaintiffs' alleged lost profits from $991,000 to $147,000. *Compare* Alexander Report, Dkt. No. [243-1] at 7-8, ¶¶ 5-6 & at 13; *with* Egan Report, Dkt. No. [243-13] at 50-52.

Plaintiffs fault Mr. Alexander for using "public information . . . without

mentioning that fact in his report." Motion, Dkt. No. [243] at 9. It is difficult to understand how they could claim that he did not mention his use of Plaintiffs' "audited financial statements," when that is exactly what Mr. Alexander stated in his Report. Alexander Report, Dkt. No. [243-1] at 7, ¶ 5. He further expressly identifies "BRP Group, Inc. Form 10-K for the years ended December 31, 2020 and December 31, 2019" as his source of the data backing his calculation of this 89%. *Id.* at 14. Plaintiffs, of course, do ***not*** dispute the accuracy of these 10-K filings with the S.E.C. If they did, Plaintiffs would face far more grave legal consequences than anything related to this lawsuit. Plaintiffs next contend that Mr. Alexander assumed that every cost in every category would have gone up. Motion, Dkt. No. [243] at 10. No, he applied Plaintiffs' historical 89% expense ratio without increasing it. They fault him for failing to include a valuation date in his report, Motion, Dkt. No. [243] at 10, which makes no difference whatsoever considering that all he did was correct one error in Mr. Egan's calculation.

Hence Mr. Alexander has reliably opined on the error in Mr. Egan's lost profits calculation, and a jury should decide which expert has the better of it. *See Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 669 (E.D.N.Y. 2013) (noting that "it is not the role of the Court at this stage to determine which party's experts have the better of the argument").

### 3. Plaintiffs Fail to Prove Prejudice Substantial Enough to Warrant Exclusion under Fed. R. Evid. 403

Plaintiffs claim to dispute the helpfulness of Mr. Alexander's opinions, Motion, Dkt. No. [243] at 11, but in truth they make a different legal argument entirely. The 'helpfulness' criterion "goes primarily to relevance." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016). There cannot be any serious argument that there is no relevance in Mr. Alexander's opinions about the flaws in Mr. Egan's calculations,[10] and Plaintiffs do not even attempt one.

Rather, Plaintiffs claim that Mr. Alexander's opinions will prejudice Plaintiffs. Motion, Dkt. No. [243] at 8. To the extent they argue that Mr. Alexander's opinions are unreliable, their argument merely repeats what has already been discussed and refuted. To the extent they argue that Mr. Alexander's opinions are prejudicial even though they are reliable, Plaintiffs truly seek refuge in Fed. R. Evid. 403, which expressly allows the court to exclude "relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury," and so forth. When a party claims, as Plaintiffs do here, that its opponent's expert fails "to accurately understand and articulate the opinions and facts in this case" and therefore

---

[10] This is in sharp contrast to Mr. Egan's proposed testimony. As explained in Defendants' *Daubert* motion to exclude Mr. Egan's testimony Dkt. No. [234], Mr. Egan's testimony is not only unhelpful, it is outright misleading.

"the trier of fact may be misled or confused" by the expert's testimony, it makes an argument to exclude otherwise admissible evidence under Fed. R. Evid. 403. *Skelton v. Action Traders, Ltd.*, 2023 WL 2542603, at *5 (N.D. Ga. Mar. 16, 2023). Plaintiffs fail to show any prejudice that would substantially outweigh the probative value of Mr. Alexander's reliable expert testimony.

### Conclusion

Defendants met their burden of showing the admissibility of Mr. Alexander's opinions by a preponderance of the evidence, and Plaintiffs have failed to meet their burden of showing undue prejudice that substantially outweighs the probative value of Mr. Alexander's testimony. Accordingly, the Court should deny Plaintiffs' *Daubert* Motion to Exclude Expert Report and Opinions of J. Lester Alexander, III, Dkt. No. [238].

Respectfully submitted this 8th day of September, 2023.

*/s/ Steven D. Pearson*
Steven D. Pearson
Smith Gambrell & Russell LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 360-6954
sdpearson@sgrlaw.com
*Admitted pro hac vice*

Leah Ward Sears
Georgia Bar No. 633750
Smith Gambrell & Russell, LLP
1105 W. Peachtree Street N.E.,
Suite 1000

Atlanta, GA 30309-3608
Telephone: (404) 815-3506
lsears@sgrlaw.com

John E. Bellus, Jr.
Georgia Bar No. 049728
F. R. Josh Stone
Georgia Bar No. 684075
Melissa Buckshorn
Georgia Bar No. 315480
Stone & Bellus, P.C.
6849 Peachtree Dunwoody Rd.
Building B-3, Suite 100
Atlanta, GA 30328
Telephone: (770) 390-9950
john@stonebellus.com
josh@stonebellus.com
melissa@stonebellus.com

***Attorneys for Defendants***

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Steven D. Pearson*
Steven D. Pearson

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed this DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' DAUBERT MOTION TO EXCLUDE EXPERT REPORT AND OPINIONS OF J. LESTER ALEXANDER, III with the Clerk of Court using the CM/ECF system, which will send electronic notification to all participating attorneys of record:

Todd C. Duffield
Susanna J. Bramlett
Katherine H. Krouse
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
191 Peachtree Street, N.E., Suite 4800
Atlanta, Georgia 30303
Todd.duffield@ogletree.com
Susanna.bramlett@ogletree.com
Katie.krouse@ogletree.com

Daniel P. Johnson – *admitted pro hac*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4520 Main Street, Suite 400
Kansas City, Missouri 64111
Daniel.johnson@ogletree.com

This 8th day of September, 2023.

/s/ Steven D. Pearson
Steven D. Pearson